Ladies and gentlemen, I understand from our courtroom deputy that you folks have figured out how to divvy up the time. We're going to start with Mr. Court for 30 minutes, then Ms. Baird for 5 minutes, and Ms. Ballatore-Williamson for 5 minutes. Do I have it right? Great. Okay, we'll put 30 minutes on the clock for Mr. Court. Good morning, sir. Good morning. May it please the Court, Paul Court, for petitioners in both the San Joaquin Valley and L.A. cases. My plan this morning is to walk through the Chevron analysis, and if possible, I'd like to reserve 10 minutes for rebuttal. Under Chevron Step 1, if the intent of Congress is clear, that is the end of the matter, for the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. Congress's intentions here are perfectly clear. Congress was clear not only in its goal that areas would finally meet the one-hour ozone standard in place at the time of the 1990 amendments, but also in how that goal was to be achieved. In the most ozone-polluted areas, like the San Joaquin Valley and L.A., Congress allowed more than 20 years to meet the one-hour ozone standard, but it required that if all else failed, at the end of that 20 years, major industrial facilities would be subject to the pollution fee in Section 185. In Section 185, Congress was clear about who will pay the fee, how that fee will be adjusted for inflation, how the fee will be calculated, the narrow exemptions available, and how that Congress was so committed to this fee that it even specified that if EPA finds, quote, the fee provisions of the implementation plan do not meet the requirements of this section, that EPA was not only required to disapprove the plan revision, but to collect the fee itself. Congress was clear that if San Joaquin Valley and L.A. found themselves unable to meet the requirements today, Congress intended major stationary sources to be subject to the market incentive program outlined in Section 185. This should be the end of the analysis. EPA's deviation from this path should be rejected. Yet EPA maintains that because it found the ozone problem was even worse than Congress knew, Congress's intentions are no longer clear, that EPA now can rewrite the specific provisions provided by Congress. EPA can point to nothing that supports such a conclusion. It's worth stepping back for just a minute to review the history of how we got here. In 1997, EPA concluded that the one-hour standard was insufficient to protect public health and needed strengthening. EPA adopted a new eight-hour ozone standard in addition to the one-hour ozone standard. If EPA had stopped there, strengthening the one-hour ozone standard, but leaving, sorry, strengthening the ozone standard overall, but leaving the one-hour ozone standard in place, there'd be no question as to what was supposed to happen in San Joaquin Valley and L.A. vis-a-vis Section 185. EPA would not be able to deviate from the requirements of Section 185 and would have no choice but to implement Section 185 as written. EPA maintains, however, that because it changed its mind in 2004 and chose to revoke the one-hour standard, mainly as an attempt to avoid Section 185 and these other subpart two requirements, that now, all of a sudden, we can't discern what Congress intended for addressing ozone pollution in these areas. Suppose they had relaxed the standard. What could they have done? If they had relaxed the standard, Section 172E provides that EPA can adopt or has to ensure that control measures or not less stringent alternatives remain in place. And if they strengthen the standard, why doesn't the same logic apply? Well, first, the plain language of Section 172 doesn't apply. Again, strengthening the standard, nothing changes. That's what troubles me here. If going returning to Chevron, if there is a gap in the statute, then we owe a certain amount of deference to the agency. And I guess what troubles me is that Congress clearly provided that where there is a relaxation as you were just asked by Judge Silverman, then it can adopt alternatives. And there doesn't seem to be any provision there for what happens if it strengthens it. So it appears that the agency is arguing that that's a gap and they can fill it in. Right. So let's break this apart. If there were strengthening, again, with no revocation, there's no gap. Right. Strengthening with revocation, the one-hour standard continues in effect just as before. Nothing changes. So the gap that they claim is that strengthening with revocation now makes everything unclear. And there's no logic to that. If the standard is strengthened and the one-hour standard is not revoked, we know what happens. If the standard is weakened, we know what happens. Now the claim is standard is strengthened, but we choose. And there's nothing that compels that choice. We choose to revoke the standard. Then all of a sudden, it's a free-for-all. The question, if there was any question, was whether these control requirements should remain in place following strengthening with a revocation. That question was answered in South Coast. Counsel, I mean, this may be a naive question in your field, but is this the argument when Congress says, if you relax the standard, then, of course, you can make certain changes, but they can't be less stringent, et cetera. And you interpret that. It's like saying, well, if A happens, you have permission to do B. And then you want to make that a statute that unambiguously says, if A doesn't happen, you're forbidden from doing B. And is that your position, is that there's a negative, there's a prohibition implicit in the authorization? Well, yes, in part. That's true. And that's a fairly basic premise of statutory interpretation. Where Congress authorizes specific legislative authority in one circumstance, it is assumed that that same legislative authority has not been delegated in other circumstances. And again, step back and say, and recognize, if there were strengthening here without revocation, there's no question. Section 185 applies. So why, why would it be different based on whether or not EPA chooses to revoke the one hour standard? Why would Congress's intentions be any different when the ozone problem is just as bad as Congress assumed? Well, if Congress relaxed the standard, if the EPA relaxed the standard, it would revoke the old standard, wouldn't it? No. So, sorry, if the agency? Wouldn't it be natural if the agency decided to relax the standard, that it would revoke the old standard? If it relaxed the standard? Yes, or yes, yes. Right. So the questions are strengthening versus relaxation. If we strengthen the standard, we also are substituting, so we're revoking the old. Isn't that? Right. Again, if you, if we're trying to discern what Congress would have intended here. Right. And Congress here said, we want to fix this one hour ozone plan or standard or, you know, the failure to meet the standard. And by the way, subpart two was added because it wasn't working before, right? This sort of discretionary approach wasn't working. And so Congress said, we need to lay down some specific requirements on how you're going to achieve that standard. EPA finds that that standard needs to be strengthened. Why would Congress's intentions that these areas continue to meet these requirements and finally achieve that level of pollution change? That's the problem with EPA's argument here. They rely on a statutory provision that doesn't apply. Well, they sort of rely on it. They rely on the principles of it. But now they want to extend the specific language of it. But again, the statute gives EPA no such authority. And they're inventing authority out of, you know, plain air here. The statute's control measures do not disappear or sunset when a standard is strengthened. And there's no statutory basis for saying strengthening with revocation is any than strengthening without revocation. Nothing in the statute changes that analysis. And again, to the extent there was any ambiguity about what control measures remain in place, that question was answered in South Coast. And the D.C. Circuit said that after revocation of a standard, these control measures remain applicable requirements. So there is no gap for EPA to fill anymore. We know that those control measures remain applicable requirements. There's nothing that necessitates EPA's ability to start rewriting those requirements. Section 185 continues to be applicable. And there's nothing in Section 185 that makes it difficult or confusing or ambiguous as to what's required in these areas. EPA's analysis of Section 172, again, is misleading because it doesn't apply to the strengthening of standards. It only applies to the relaxation. And the conclusion in South Coast was simply that if Congress intended control measures to remain in place with a weakening of the standards, as it did in Section 172e, then certainly it meant for those control measures to remain in place with a strengthening. And as I mentioned, the existence of the South Coast Court held that these measures remain applicable requirements, even with a revocation. Okay. But that doesn't really answer the question. Well, right. And there's no need. There's this question is a made-up question, you know, do we get to now invent equivalent alternatives?  There's no, there's nothing in the statute that says, that suggests they have that authority or that necessitates that they have that authority. We know that with strengthening, Congress meant these controls to stay in place. The controls continue to apply. Congress was specific about how they wanted areas not meeting the one-hour standard to meet those one-hour standards. South Coast said Congress put states on a one-way street to attainment. Everything in the statute is now, from Petitioner's perspective, very clear. And the legislative history only reinforces Congress's obvious intentions. Well, if they do measures that are not less stringent, why is that? You're, in essence, arguing that that is permitting backsliding. I understand it because that's what was the concern in South Coast. We have fundamental policy differences with EPA's new chosen policy. But that's not the reason that this is not allowed. The reason this is not allowed is because Congress rejected the idea that EPA should have this sort of open-ended legislative discretion to come up with whatever strategy that they thought was appropriate. That was why Subpart 2 was adopted. Because that prior discretionary, open-ended, flexible strategy where EPA and the states had free reign to decide what the best policy choices were, it didn't work. And so Congress stepped in and said, we are going to outline minimum specific requirements for you, and we expect all of these requirements to be met. And as I said, Section 185, they said, not only do states need to adopt this, but if they don't, EPA, you need to implement this section. So to now suggest, again, the problem is even worse. Problem continues just as before, and now EPA is free because it chose to revoke instead of not revoking the one-hour standard. EPA can choose whether, on the one hand, it is guided, mandated by statute to apply this fee, or it is free to rewrite the entire provision of Subpart 2. Because the analysis here is not limited to Section 185. It applies to any Subpart 2 requirements. The D.C. Circuit in South Coast and the Supreme Court in Whitman both point to the legislative history in rejecting similar attempts by EPA to replace the specific requirements of Subpart 2, including Section 185, with a more discretionary scheme. What's interesting here is that even EPA, in its original implementation rule for the ozone standard, concluded that these requirements would remain in effect. Now, at the time, EPA wanted to drop Section 185 and the other Subpart 2 requirements. But their argument there was that these requirements didn't apply. There was no argument that it could rewrite the requirements that do apply. And they even said in their implementation rule, quote, Congress would have intended that control obligations that applied for purposes of the one-hour NAAQS, National Ambient Air Quality Standards, should remain in place. And it wasn't until industry offered this idea of alternative equivalence in 2010 that EPA claimed this new authority. Would you explain to me how it would work if they kept both the one-hour and the eight-hour? Yeah. So here's what's particularly troubling about the approach here. Congress gave areas 20 years to meet the one-hour standard. So 1990, 2010 was their deadline. EPA strengthens the standard in 97 and effectively resets that 20-year clock. And so these areas now don't need to meet the 1997 eight-hour standard until 2023, 2024. So EPA is just kicking the can down the road. Now, admittedly, these are more stringent standards. But under their interpretation, fees may never kick in because they can keep resetting the standard, keep moving the deadline, revoking the old standard, and none of these requirements ever has to be implemented. Nobody ever has to attain the standard. Other fees kick in, don't they? That are not less stringent than these fees. No, no, no, no, no, no other fees. So South Coast is a great example. Their calculus is, we got all these federal grants from the stimulus program. We've gotten these California grants. And they just add those numbers up and they say, look, that's as much money as we would have collected on the fee. There's no fee that kicks in here. South Coast, sorry, Sam Joaquin adopted a vehicle registration fee. But again, they did that before they sort of worked their way out of this rule. That fee doesn't go away. I'm looking at the EPA order in the South Coast case. Yeah. Page, what is it, 74, 377. It says, thus Rule 317, by ensuring the expenditure of these funds on the primary cause of ozone nonattainment is likely to be more effective in producing real reductions in ozone pollution than a 185 fee program. Yeah, it's so misleading. Well, misleading or not, did you challenge that finding? I don't see where you said. No, I mean, we don't. So they say this is even going to be better than 185. And that's not really been challenged that I can tell. Well, no, in our reply brief, we talk about how these are unsupported allegations, you know, and that it's not an either or choice. These fees are there. Even if you challenged it, I mean, they made this finding. Maybe you made some oblique reference to it in the reply brief. I don't know. But what do you make of that? Well, it's again, it's just false. So it's a false comparison. These monies, again, they got highway stimulus money that they're going to spend on, you know, HOV lanes or whatever it is. They may have a benefit for pollution. But that doesn't mean that that's better than also imposing the fee. That's your opinion, but that's not their opinion. You haven't challenged that. Well, what did you say? Go ahead. I'm sorry. I said that's your opinion, but that's their opinion. That's right. And this is the debate that we should not be getting into in court because Congress has already made these policy choices. So I'm confused now. Are you now saying that you have challenged their assertion that these are not less stringent? We had, we challenged it in the context of our standing argument because they made a standing argument that we won't be hurt by this because this program is even better than Section 185. And so we point out that that's just not true. And it's not an appropriate way to look at this. So, but otherwise, no, we, you know, the point is to avoid these policy decisions. Congress made the policy choices and EPA is not free to second guess those policy choices. That's, that's the point of doing the statutory analysis. Let me, let me just finish with the Chevron step two argument, because, you know, I think the same principles are apparent there. That even if Congress's intentions cannot be clearly discerned, which is not the case here, we know what Congress meant to happen in these areas. And we know that Congress did not mean for EPA and the district to be able to perpetually put off this fee on stationary sources. EPA's sweeping claims here of legislative discretion should be rejected as unreasonable. Everything in the act and its history rejects the idea that EPA should be able to abandon the detailed prescriptions included in the 1990 amendments the minute EPA decided a more stringent standard was required. Congress adopted subpart two after decades of failure to clean up the air. Subpart two was a rejection of the prior discretionary and flexible pre-1990 approach that had failed. And it simply makes no sense to believe that in these circumstances where the pollution problem is even worse, that EPA can invent, out of statutory silence, the legislative authority to rewrite this specific scheme and to revert back to a more discretionary and flexible approach. This was the conclusion of the South Coast case. And the D.C. Circuit concluded EPA's interpretation of the act in a manner to maximize its own in enacting the 1990 amendments was to the contrary. And the Whitman decision in the Supreme Court, the Court found that subpart two was a carefully designed restriction on EPA's discretion and that it was obviously written to govern implementation for some time and was not enacted to be abandoned the next time the EPA reviewed the ozone standard. I see you're down to about nine minutes. Thank you, Your Honor. Thank you, Mr. Court. Good morning, Your Honors. May it please the Court? My name is Heather Gange. I'm here on behalf of the U.S. EPA. It bears emphasis today that these— Excuse me, we need to get the clock set properly. Twenty minutes? Twenty minutes. Yes, I'd like to give ten minutes to the interveners to divide between the two of them. My list said that you requested 20. We'll put whatever you're supposed to get. I just want to make sure we have it right. I had 20 minutes on here. Okay, so we're set. Thank you. And it bears mentioning after all of that particularly that these two consolidated cases are only questioning whether EPA's construction of the principles of Section 172E was reasonable. And that is being raised in the context of two programs that were developed by the South Coast and the San Joaquin Valley as equally or more stringent alternatives to Section 185, which is a control measure that used to apply directly under the one-hour ozone NACs, but now applies directly only under the eight-hour NACs because it ceased to apply under the one-hour NACs in 2005 when that NACs was revoked. It has been established for ten years now in four separate decisions by the D.C. Circuit and a ten-year-old EPA national rulemaking that that one-hour NACs was revoked. And along with the numeric NACs itself, all of the designations and classifications that flow from that NACs were also revoked. Now, the eight-hour NACs is completely in play. That's not at issue in this suit. But again, it also bears mentioning that all of the controls that apply for an ozone NACs, they're in place today under the eight-hour NACs. But what happened on revocation is that all of the classifications and designations that the subpart two control measures are tied to disappeared. And because, as everyone agrees in this case, section 172E does not apply on its face where an NACs is strengthened as it was here. There were no longer to be any control measures. Now, EPA completely agrees that that is not appropriate. That is backsliding. And EPA believed that was deeply, deeply wrong. And while it was not obligated to do so, it stepped up, examined section 172E, saw a clear gap with respect to what happens when an NACs is strengthened, not weakened. And in the 2004 rulemaking, filled that gap with the exact same principles that apply when an NACs is weakened in order to ensure that all of those control measures would continue to carry through, despite the fact that the one-hour NACs had been revoked. Now, 172E, its principles are articulated right in the express statutory language. And it's very helpful here to actually pull out the statute and look at the language that Congress wrote. Because there are two sentences there that articulate the principles that EPA filled that gap with. The first is a sentence that requires EPA to promulgate requirements to replace the ones that no longer apply. And the second sentence simply modifies and explains what those requirements that EPA has to promulgate ought to be. And it pretty significantly restricts EPA's discretion in promulgating those requirements by saying, such requirements, first words in that second sentence, such requirements shall be not less stringent. So when EPA is promulgating requirements as Congress specifically instructed it to do, it may not promulgate requirements that are any less stringent than the ones it's replacing. And that's the world that we're in. Well, I understand it. But could you explain to me again what you think the D.C. Circuit decided in South Coast and what it didn't? In the South Coast decision, the court decided that the one-hour NACS had been revoked along with all of its designations and classifications. And the D.C. Circuit reaffirmed that just very recently at the end of last year in the decision that was submitted to this panel in the 28-J letter. It also decided expressly that there was a gap, that 172E does not apply on its face where a NACS is strengthened instead of weakened. And it examined EPA's very careful explanation in the 2004 implementation rule that it was choosing to fill that gap with the principles of 172E itself, fill the gap with the principles Congress already thought should apply when a NACS was changed in order to ensure that there could not be backsliding, saying surely if Congress intended that air quality should not backslide when a NACS was weakened, it definitely did not intend for it to backslide when a NACS was being strengthened. The one-hour ozone NACS was revoked in favor of the more stringent eight-hour NACS. And EPA's been very clear and the D.C. Circuit's understood very clearly and said over and over again that eight-hour NACS is more stringent. Yes, but it didn't reach the question of whether the not less stringent sentence applies. That is correct. That particular issue was not put before the court. Now, in 2009, in that NRDC versus EPA decision, which I believe the South Coast discussed more thoroughly in its brief, the court was examining NSR provisions, which are different from 185, but they're also in the list of controls that the D.C. Circuit expressly held in South Coast should apply indirectly through the principles of 172E. And they overturned an EPA rulemaking saying that EPA's rulemaking removed restrictions on and therefore it overturned the rule. So the D.C. Circuit in another decision has held that the not less stringent restriction applies with respect to at least NSR in the context of the one-hour NACS. But in its next, in its 2006 decision, the question that's in front of the court today was also squarely put to the D.C. Circuit, whether the principles of section 172E allow EPA to approve alternative programs provided those programs are not less stringent, as instructed in the second sentence of section 172E. And the court declined to expressly reach that issue. But it did, while it did not squarely address the issue, it indicated, we think very strongly in dicta, that if it had chosen to address that issue, it would have upheld. Speaking of the D.C. Circuit, is there any question about whether they are in the right court to begin with? Excuse me? Is there any question whether this case is properly in this circuit? EPA believes that this case is properly here in the circuit, yes. What the D.C. Circuit even recognized itself is that an as-applied challenge to any program approval belongs in the appropriate circuit court for the particular area whose program is being reviewed. And in the 2006 NRDC decision, which was addressing this exact legal issue, the only one that's properly before this court, 172E, they expressed some real reservations in the standing discussion in that case about whether parties should be precluded from challenging EPA's construction of 172E. Now, they did not decide that issue, saying instead that this should go through public notice and comment, which it has. So we're here today in what I think most of us expected would be an as-applied challenge to these rules. But the parties all seem to agree that the petitioners are not challenging the criteria that EPA selected to determine whether or not a program is not less stringent. And they're not challenging whether the South Coast and the San Joaquin Valley programs, in fact, satisfy those criteria. Okay. Well, would you – the argument is that by revoking the one-hour standard, imposing the more stringent, you start the clock ticking all over again, and that this is, in essence, backsliding within the overall general meaning of that. Of that idea that has been disapproved and that we all agree is improper. And EPA agrees as well that it would not be proper and that it would be backsliding functionally if, in fact, all of those controls disappeared. Now, that's what happens under the literal language of the Clean Air Act. When an act is revoked and the designations go away, all of the controls are tied to your designated attainment status. But EPA stepped back and looked at that gap in 172E, and as it's explained over and over again, in the 2004 implementation rule before the D.C. Circuit time and again, in the proposed rules, in the technical support documents for these rulemakings, in these briefs, EPA believed that was wrong and that Congress did not intend for air quality to backslide when an act was changed. And EPA, therefore, made sure that that did not happen. It made sure that did not happen by filling that gap with the principles of 172E and developing criteria to say to these non-attainment areas, if you want to do anything other than the controls as currently written, you must satisfy these following criteria. They must be not restringent. They can be different, but only if, as Congress said in Section 172E, they're not less stringent. But they absolutely are there. But they no longer have to meet the one-hour requirement within the time that they were originally supposed to meet it so that the 185 controls could kick in. Isn't that correct? Because that NAAQS was revoked, the areas are no longer required to attain the one-hour NAAQS. They are absolutely required to attain the eight-hour NAAQS, not for another 20 years. That's correct. But because EPA chose to step in and fill the gap with those principles, they're not allowed to do away with the panoply of the subpart 2 control measures that did apply under the one-hour NAAQS. They could have stepped back and let that happen, but they chose not to. And they've told the states through these rules that if they would like to come up with an alternative to Section 185 as it's written, they must meet a particular set of criteria. And that program will not be approved until after it's gone through full public notice and comment. And I should point out as well, there are other non-attainment areas besides the South Coast and San Joaquin. They have not submitted alternative programs. And so 185 applies indirectly through 172E in those areas. It's only these two particular programs that issue here. But really, I think we've sort of beaten to death the fact that there's only one issue really before this court, and it's whether EPA reasonably construed the principles of Section 172E when it determined that it could approve alternative programs. In that context, I think it bears pointing out a few points that address Mr. Court's argument. When EPA filled that gap with 172E, it filled it with the same limitations that Congress had put on its requirement promulgating authority in 172E. When an act is weakened, and the term not less stringent is not defined in the statute, which means under the well-recognized principles of Chevron and the subsequent authority that the authority to construe that phrase has been delegated to EPA. And where something's not defined in a statute, you normally assign it its common, normal, everyday definition. And it also bears pointing out that where Congress intended that control measures not be changed in any way, it expressly said so. And a good example of that is Section 193 of the Clean Air Act. It's 42 U.S.C. Section 7515, which does state specifically that no control requirement, in effect, are required to be adopted, can be modified in any manner. And that applies to different circumstances under the act. But as has already been pointed out today, where Congress intended something, it normally said it. And we know from Section 193, which was promulgated at the same time as Section 185 and at the same time as Section 172E, when it did not want something changed, it said so. And in Section 172E, it specifically directed EPA to promulgate a new set of requirements with the restriction that they be not less stringent. We would submit that there's not a credible reading of that that says you must ignore the second sentence and you must import a requirement that these new requirements be identical to what's being replaced. Would you explain why these, what the old, the old controls under 185, I take it, relate to non-stationary sources and fines and on the sources and the new ones are different. Could you explain what they are again, the no less stringent controls that you've imposed? The, when EPA looked at the not less stringent requirement in 172E, which is not defined, and looked at Section 185, and I should emphasize that these rulemakings are directed only to Section 185 and the one hour NACs in the South Coast and the San Joaquin Valley. That's it. They do not have wider application. It looked very carefully at 185. And while it speaks in terms of stationary sources and payments of money to the state, what it appeared to be directed to was lowering emissions. As the D.C. Circuit explained, its purpose was to create an incentive program that would heavily incentivize emission reductions. So EPA looked at the financial aspect of that. There was a very definite and specific amount of money to be collected and a goal of lowering emissions and determined that in order to be not less stringent, an alternative program needed to be collecting or administering an amount of money that was at least as much as Section 185 would have collected. And that either needed to be directed to emission reductions or in fact, this alternative program really did need to achieve at least as much in emissions reduction as direct application of 185 would. It did. Yes. And that is, again, that's explained very carefully in the proposed and final rules and the technical support documents, all of which are in the record here. And so the program submitted by the South Coast and the San Joaquin Valley were held up and examined against those criteria. And although the criteria and compliance with them have not been challenged in this case, since you've asked, I point out that the- Who's paying for this? No. In the San Joaquin Valley, fees are being collected from major stationary sources, from mobile sources, from a tax on registration. And those monies are- A vehicle. A vehicle, that's right. If you register a vehicle in the San Joaquin Valley, you have an additional tax to pay for that purpose. And those monies are directed to emission reduction programs. And I should point out that Section 185 imposes no requirement that the money collected be used for emission reductions whatsoever. Whatsoever. In the South Coast, the area identifies specific emission reduction programs and ensures that either the same amount of money is being spent on those programs as would have been collected under 185. If that total falls below what would be collected under 185, they then turn to the same stationary sources identified in 185 and begin collecting fees from them as well. And that program also specifies that the monies have to be used- So the utilities and the manufacturers and other stationary sources are no longer paying for this. It's the people who own the cars and trucks. In the San Joaquin Valley, it is the major stationary sources as well as mobile sources are directly paying. I should defer to Council for the South Coast for the specifics, but our understanding is that they identify programs that actually are expending sums for emission control reduction. And if that amount is not the same as what would be collected under 185, then they collect the difference from major stationary sources. But I'm sure that they can explain that to you much more carefully. But it is true that in the South Coast, at least up front, they're not going to the exact same pool of people in 185. But again, as EPA looked at the undefined, not less stringent restriction, they look to the real purpose of Section 185, which is to reduce emissions and to do so by expending particular sums of money. Sort of the people who register their cars really have very little control over what is their emissions. And they have the car, but these big stationary sources have technology at their disposal to try to use the best technology to reduce the emissions. And so it seems not quite as effective to say we're going to have the people who have no control pay for this while the people who do have don't. With respect to that, Your Honor, the petitioners could have raised that challenge. They could have come in and in their briefs, they could have challenged EPA's criteria. They could have challenged EPA's interpretation of an undefined term, the definition of which was committed to the discretion of the agency. They could have, but they chose not to. And they could have come- So you're saying that goes to the whether or not this is not less stringent than they have? It comes, that, respectfully, that really is a challenge to EPA's criteria, whether EPA correctly defined the term not less stringent. The only question that's really properly before the court today is whether EPA correctly construed Section 172E when it determined that it actually had the authority to approve programs that are not less stringent. Whether as a threshold matter, it actually could entertain such programs and potentially approve them. But petitioners could have, but chose not to, challenge whether EPA's criteria were, in fact, permissible and whether, if the criteria were permissible, whether the South Coast and San Joaquin Valley programs actually satisfied them. Thank you, Ms. Gale. I think we'll turn now to Ms. Baird for South Coast. Hang on, we're getting the clock working. There we go. Good morning. May it please the court, Your Honors, Barbara Baird. I'm Chief Deputy Counsel for the South Coast Air Quality Management District. I'd like to try to follow up on some of the questions that were raised earlier. I'm actually going to go back to Judge Schroeder's concern and question regarding the possibility of EPA resetting the clock by revoking the previous standard as they make the current standard more stringent. I think it's important to note that in this particular case, we went from a one-hour standard to an eight-hour standard. And in that implementation rule that EPA adopted in 2004, they actually found in several different places that the prior one-hour standard was no longer necessary to protect public health. In fact, the form of the standard was not appropriate. So when they revoked that particular standard, they were saying, that standard isn't needed. So it essentially was like a relaxation of an old standard, saying that standard is no longer needed. So when they went on and adopted the new, more stringent standard, the panoply of controls that would apply under the new, more stringent standard still will go into effect. The only issue of... I'm sorry. I don't understand what you mean by no longer needed. Well... That is what EPA found in the 2004 rule. And it had to do with the fact that the EPA was determining that the one-hour form of the standard really wasn't an appropriate measurement. It hadn't worked. No, not that. Not so much that, as that it wasn't the right measurement to protect public health. So I think that that was a case where EPA made a conscious decision that revocation, as opposed to leaving the former standard in place, was an appropriate way to deal with that standard. They felt that it wasn't necessary, which, to my way of thinking, is very similar to finding that the standard should be relaxed. But in either case, the former standard wasn't necessary. So this case doesn't present any precedent for concerns about what EPA might do in the future when they adopt more stringent standards. We have to look at the case that stands before the Court today and say it's a unique situation where EPA decided that the appropriate thing was to revoke that standard. And as follows from that, according to the South Coast decision, quote on page 899, the only remaining requirements for the one-hour NAAQS are the anti-backsliding requirements. And so in this case, Mr. Court has been arguing as though Section 185 applied directly to the facts, but that's already been decided that it's actually only the backsliding requirements that still apply to the revoked standard. There was another argument raised by Mr. Court that had to do with the concern that the fee programs that EPA has approved were already adopted prior to the time that the 185 rules were adopted. This argument was not raised before the agency or in the opening brief, but there is a case cited in Shan Joaquin's brief that actually addresses this issue, and that's Louisiana Environmental Action Network. Which deals with a approval by EPA of a contingency measure, and that's a measure that goes into effect if an area either doesn't meet a milestone or doesn't attain the standard on time. And so this case, 185, is exactly like a contingency measure. It goes into effect if the area doesn't attain the standard on time. In that Louisiana Environmental Action Network, the court said that EPA could approve a contingency measure that had already been adopted and implemented or begun to be implemented before the need was actually demonstrated for that measure. The court said that the emission reductions were surplus, and it would be illogical to penalize the state for taking early action to implement a contingency measure. So even if this argument had been properly raised by petitioners, which it wasn't, I think this Louisiana Environmental Action Network said EPA properly approved a fee program that was adopted before the need was actually shown. It continues on into the future, just as was the case in Louisiana Environmental Action. There was also some concern about the effectiveness of the programs that apply fees to mobile sources instead of stationary sources, because the mobile sources don't have very much control over what they emit. Ms. Beard, you're out of time, but I believe the judge has a question. Yes, one question. Just going back earlier in your remarks, are you contending that we can view what happened as a relaxing of the standard because depending on the exact numbers that are chosen, a set of circumstances that would have violated a one-hour standard, because there was a peak hour, wouldn't violate an eight-hour standard. So are you suggesting we could look at this as at least in part a relaxing of the standard? Well, that actually is what was argued by the petitioners in the South Coast case. There were a couple of cases of quotations that are cited actually in the National Environmental Development Association brief. At footnote 11, the petitioners argue if EPA is allowed to revoke the one-hour standard, which is the case here, it has in effect relaxed that standard. So section 172E is directly applicable. And there's a similar quote found on, I believe it's quoted on page 33 of the AMITA brief, where the petitioners make that argument. What I'm saying is in this case, because the standard was found not necessary, it's similar to a relaxation. Yeah, you were going to address the point of the mobile stores versus the stationary. First, I wanted to point out that it's not just industries and utilities. I was looking at our 2012 equivalency report the other day and found that there were two facilities owned by the Los Angeles County Sanitation Districts, basically sewage facilities, that had they had to pay the fee, would have totaled a million dollars a year for that survey, for that obligation. And it is true that the fees do not apply to stationary sources because we, our board determined that there was very little, if anything, that stationary sources could do to reduce their emissions in the short term. As needed, and that the important goal of Section 185, or what remains of it, in the case of a revoked standard, which is only the anti-backsliding, is that it get emission reductions. So you've taken away the incentive for them to develop more control. Well, we don't believe that that incentive would actually cause emission reductions because there's so little that they can do. So the chances are they would pay a fee. Under Section 185, the fee does not need to go to any emission reduction purpose. But under the programs that EPA has approved, the money does need to go to reducing ozone. Thank you. Thank you, Ms. Bellator-Williamson for San Joaquin. Good morning, your honors. Annette Bellator-Williamson, District Counsel for the San Joaquin Valley Unified Air Pollution Control District. I just want to embellish a few of the points that have already been raised. First of all, I want to emphasize that this is the third attempt by the same petitioners and their same counsel to address the applicability of Section 172E in the context of the revoked one-hour ozone standard. There are essentially two issues that we've been discussing about all morning. The first issue, whether Section 172E applies at all as the means to impose Section 185 to the revoked standard, was argued by these same petitioners and decided in the 2006 South Coast case where the court could not have stated it any clearer at page 899 of that opinion, quote, Section 172E regulates what EPA must do with revoked restrictions, close quote. Petitioners' argument in this proceeding that Section 172E does not apply now to the revoked one-hour standard is thus barred by principles of judicial estoppel and issue preclusion. By deciding the first issue, the outcome of the second issue whether EPA has authority to approve alternative control measures necessarily follows by operation of the plain language of Section 172E. And as has been discussed already, the D.C. Circuit in both the 2009 NRDC versus EPA decision at 571 F3D 1245 and in the 2011 NRDC versus EPA decision at 643 F1311 demonstrated the proper analysis under similar circumstances. In the 2009 NRDC decision, the court disapproved EPA's removal of a time limitation on a new source review control for the revoked one-hour standard on the grounds that the modification made the control less stringent in violation of Section 172E. In the 2011 NRDC decision, the court analyzed EPA's proposed attainment alternative to Section 185 penalties and held that because the attainment alternative allowed for continued violations of the revoked one-hour standard, it too ran afoul of the not less stringent requirement of Section 172E. Thus, it's really settled law at this point that the relevant inquiry for whether a control measure satisfies Section 172E is whether that control is not less stringent than the otherwise existing requirement. In addition, this court had a question earlier about untimeliness and improper venue and both issues raised by petitioners in this case are barred on that point. The CLEAN Act requires challenges to a nationally applicable EPA regulation such as the 2004 implementation rule to be filed in the D.C. Circuit within 60 days of the rule's publication. Petitioners try to circumvent this rule by arguing that Section 172E can be split into two parts by divorcing the requirement that controls applicable to a non-attainment area remain applicable after EPA revokes a standard from the requirement that such controls be not less stringent. I asked Ms. Gange if this case is in the right court and she said yes. I take it you disagree with the EPA? Well, I think that her she qualified her answer by saying yes, if there if there challenges an as-applied challenge to the criteria that EPA applied to to the alternative program Section 185E programs adopted by South Coast and San Joaquin. But they're not making that challenge. They may have tried to articulate that challenge in their petition for review but their briefs today they've clearly disavowed that argument. What they're really arguing is that A, Section 172E doesn't apply and even if it does the EPA doesn't have discretion to approve attainment alternative programs under the principles of Section 172E. Hypothetically, if you're right then what do we do? Do we transfer the case to the D.C. Circuit or what? I suppose that's one alternative or the well, I think the alternative is to deny the petition because those issues the two issues have also already been raised and argued and decided by the D.C. Circuit in the South Coast case and in the two NRDC decisions that I've just explained. I mean, if we don't have jurisdiction over the case we really can't do anything on the merits, can we? I'm sorry? I mean, if we don't have jurisdiction we don't have any jurisdiction. Then I think the appropriate solution would be to reject the petition on that basis for lack of jurisdiction. I mean, really the only issue that's not jurisdictionally barred as EPA explained is is whether the alternative program for implementing section 185 fees as a control measure for the revoked one-hour standard is not less stringent than the applicable requirement before the standard was revoked. And again, at page 26 to 27 of petitioner's reply brief in the San Joaquin case, at least they've expressly disavowed making that argument. Judge Carter, Judge Garbus. Thank you, Ms. Bellator-Williamson. Thank you very much. Thank you. Mr. Court, back to you. You've got the last word. Ms. Garrett. I just want to be very clear after that last exchange. EPA does believe that this case is in the right court and there's only one issue that is properly before this court and that is whether EPA reasonably construed section 172E principles to allow it to entertain and approve alternative programs. Thank you. Thank you. I think you've got about nine minutes left. All right, a lot to cover. First on this jurisdictional question that you were raising there at the end. Again, the argument that was raised was that this issue was resolved in the 2004 implementation rule and that this is therefore time barred would have belonged in the D.C. circuit. EPA explained in its final rulemaking in the San Joaquin Valley and this is at the San Joaquin record at page six. The South Coast Court did not, however, address the specific issue of whether the principles of section 172E required section 185 itself or any other controls, not less stringent. This issue was not presented in the South Coast case. It was not presented in the 2004 implementation rule. As I mentioned, in the implementation rule, EPA said applicable controls remain applicable. And it was raised in the context of this regional. Exactly. And that was in the D.C. circuit case, the NRDC, lots of NRDC cases today, the 2011 where we challenged the fee guidance that raised this issue of equivalent alternatives. The D.C. circuit recognized that this was a new issue. It was not resolved in the implementation rule and so on. I take it that you would say EPA would have had the authority to keep the old controls in effect. Not just the authority, they were mandated. Yes, absolutely. In terms of the jurisdictional argument. Right, right, right. Didn't know that they were going to do alternative controls. Exactly. This was a new idea that has been floated first in the guidance. That was rejected. Now they've tried to raise that argument here. This is the proper place to challenge that. I want to clarify some of what I think is the confusion about what's happened to the one hour ozone standard. Because you talk about the one hour ozone standard being revoked. I think counsel for EPA said it ceased to apply, ceased to exist. There are no designations. Again, the South Coast decision said these requirements remain applicable even with the revocation of the standard. They said, in addition, section 185, not some duplicate of section 185 or section 185 through section 16. Section 185 must be enforced under the one hour NAAQS. There's nothing out there that has changed. These areas continue to monitor, measure one hour ozone concentrations. You can look up on the internet and see the one hour concentrations in LA and the San Joaquin Valley. EPA continues to make findings on attainment or non-attainment. In fact, just this last year, the district in LA updated their one hour ozone plan. And EPA approved that at 79. Fed read 52, 52, 6. This is September 3, 2014. This court in 2012, again, after the revocation, threw out the one hour ozone plans for both LA and the San Joaquin Valley. It's not that the standard has disappeared. It's still out there. EPA is still making decisions about attaining it. And the South Coast court said these requirements remain applicable in these areas. And so the question is, given that we're still measuring, we're still developing plans, we still have to attain this standard, does it make sense? Would Congress have said, given all that, you can change the whole strategy that we've laid down in subpart two for these areas to finally meet these standards? That's the Chevron step one question that we've presented. That revocation has not changed anything with regard to Congress's intentions about how this standard should be met. What is the effect of revocation? And I'm kind of losing you there. Yes, right. And I'm glad. So the effect, their original, their original... Glad you lost me. You've succeeded, I'll tell you. The original purpose, the original intent in that 2004 rule was to avoid section 185 and these other subpart two requirements. And the South Coast said, South Coast court said, no, you can revoke the standard, but you can't escape these requirements. These requirements must be enforced. Section 185 must be enforced. These requirements remain applicable. So the net effect, the net effect really is it means that there'll be no new one hour non-attainment areas. I thought that they didn't really consider what the second sentence of 172. And there was no need. Right? I mean, that's like Congress was clear what's supposed to happen in these areas. There's no, you know, the Congress laid it out. The South Coast court said these requirements continue to apply. Why then? Again, where's the gap? Why does EPA suddenly get discretion to rewrite all these requirements? That's the Chevron argument. I want to just point out this argument that South Coast suggests that the revocation of the standard was a relaxation. And therefore, maybe we are governed by the letter of section 172E. First, of course, that's not an argument that EPA has made. That's, and, you know, State Farm, EPA's, you know, rationale must be based on arguments that the agency itself has argued. That's not the basis for EPA's argument here. And frankly, it's counterfactual. In the final rulemaking, again, at page six in the San Joaquin record, excerpts of record, EPA said, EPA's eight-hour standard is recognized as a strengthening of the NAAQS. In its fee guidance, it said 172E does not directly apply where EPA has strengthened the NAAQS as it did in 1997.  that this was a strengthening. It's simply counterfactual and not an argument that should be entertained. Council for Government poses this question as an interpretation of section 172E, that that's the question for the court. But that is not the question for the court because 172E does not apply. The plain language of 172E does not apply. And EPA has repeatedly said, 172E does not directly apply. So the question is, what does 172E tell us? And that was their argument in the 2004 implementation rule and the argument before the South Coast and really the reasoning of the court in the South Coast. And that reasoning, that argument was, all right, we know that Congress didn't want relaxation when there's a weakening. That's spelled out in 172E. Congress didn't provide a provision for strengthening. And I've talked about why that makes sense because these requirements continued in effect. What EPA has invented is this question, okay, we know what would happen with strengthening if we'd left the standard in place. But what happens if we strengthen and we revoke the standard? Oh, now we have ambiguity. That's the argument here. It's not about the language of section 172E. This is a question of how do we answer that statutory silence? And what doesn't make sense about their argument is that we would inject all of the language of section 172E to fill that. That's never been, that was not the decision in the South Coast case. And it was not even EPA's argument. EPA said 172 informs the interpretation of this silence. And the South Coast agreed. It informs it to the extent that it says these control measures do not disappear. That's the end of the question. There's no gap that now necessitates EPA to also be able to rewrite these requirements. One final point. I know there's a lot of discussion on the policy and I would just point the court to our reply brief in the Sam Joaquin case starting at page 27 where we talk about why these policy arguments don't make sense. And also I'd point out to you in the LA excerpts of record at page 37, attachment A to the South Coast rule. In that, it lists out all the sources of funding that South Coast is relying on as their equivalency. Most of it is coming from the federal government. So the irony here is that Congress set up this scheme saying, finally, if you don't do, if you don't meet this standard, major industrial sources are going to have to pay a fee and the equivalent that EPA has come up with. And we're not challenging the equivalency because that's a losing battle, right? Once EPA has this discretion, it's sort of game over. But the irony is that EPA is saying the Department of Energy, EPA, stimulus funds, that will cover the 185 fee obligation in the statute. Thank you very much. Thank you, Mr. Court. Counsel, thank you as well. The case just argued is submitted.
judges: Garbis, Schroeder, Silverman